Welcome to the second day of our panel sitting here in Atlanta. Judge Legault and I are very pleased and happy to welcome District Judge Eileen Cannon from the Southern District of Florida. She is a graduate of the University of Michigan Law School and she began her tenure on the bench in late 2020, if I'm not mistaken. So we're very glad that she's here and we appreciate her help with our cases. Thank you. You know the lighting system. When the yellow light goes on, that means that your time is drawing to a close. So begin wrapping up. If we take you beyond the red light, don't worry about it. Just keep going. You'll be on our time and not yours. And with that, we're ready to begin our first case, number 22-11159, United States v. Tierza Mapson, Charis Mapson, and Alyssa Mapson. And we granted some additional time for this case. And Mr. Smith, you're going first. All right. Okay. Whenever you're ready. Thank you, and may it please the Court. Tierza Mapson was convicted on five counts that each required proof beyond a reasonable doubt that she specifically intended for one of her sisters to shoot Joshua Thornton. The proof was so lacking that at the end of the trial, the jury was left with a horse-sense, multiple-choice guess as to what Tierza intended and expected that her sisters would do. Would they arrive at the designated site and make up some excuse for why Tierza and the child weren't there? Would they confront Mr. Thornton with an ultimatum to just stop? The child doesn't want to leave her mother and be with you. Or did Tierza expect exactly what happened? That's what the government contends. And each of those was a possible way of seeing the evidence, but no evidence pointed toward a specific answer, and that includes none pointing toward the answer that the verdict furnished as to Tierza's intent. One of the pieces of evidence that I think is most helpful to the government, I don't know if it's enough or not enough, are the phone calls indicating that she was on the way, delayed, wasn't able to get there because the child had had an accident, the car had thrown up, etc., etc. So how do you deal with that evidence? In my view, and I speak wholly for myself, there's certainly enough evidence that she intended with her sisters to get him to that spot. Would you agree with that? I don't think there's any question. Those communications show that she intended for her sisters to go, and I think it's a reasonable inference that she intended that in some way they would intercede, and I've listed And there's evidence that she changed the location from the location that he had chosen, which was more open. Well, that she was the one who communicated that location to him, I agree. But there was an initial location that they had agreed upon, and then it was changed to that location based on her suggestion. So I agree that the alternate, so they'd suggested, he'd suggested a Loves station, and she was the one who sent him a text suggesting the alternate location where they did meet up. Alyssa was with Tirza at the time that that text was sent, so, you know, while Tirza was the one communicating with Mr. Thornton, we don't have any way to really know who that change came from. We know that Alyssa texted Charis shortly after that to give Charis this on this has been essentially that Tirza had to have known what they would do, and certainly, as Judge Jordan points out, Tirza knew that she was misleading Mr. Thornton, and I don't think there's any doubt that Tirza knew that at least one of her sisters was headed to the same location, but, and now that we look back in hindsight, I think it's very easy to see this as a unitary event that turned out the way it turned out and never could have been otherwise, but that isn't, the way that it unfolded actually was a pretty unexpected way unless you were in on the plan, and not just in on the fact that there was a plan to deceive Mr. Thornton, but in on the idea that Alyssa and Charis would come up with the idea that shooting him would be the way to solve this problem and to solve Tirza's concerns about unsupervised visits, and there just isn't anything that points toward Tirza knowing that that's what her sisters would do now. Part along the same lines, how about the number of phone calls between Tirza and her sisters? On the day of the event, yeah, so we don't, we know some of the content of some communications insofar as they were text messages. Other times we don't. We know that a lot of those calls, the ones that we can infer content about, in addition to the ones where we know the content, are ones where if Tirza would get a call or a text from Mr. Thornton or his mother, pretty much without exception, there is one exception that I'll note in a moment, but without exception, when she would get a message, instead of responding to it or instead of answering the call, she would call one of her sisters, and if she didn't get an answer, she wouldn't respond to Mr. Thornton or his mother until she heard back from a sister. And, you know, we can put a sinister gloss on that if we're looking for one, but it fits into a larger pattern of her family managing her life, her contact and communications with Mr. Thornton in very fundamental ways from the outset. You know, she couldn't go on dates with him without her mother approving it. He couldn't. Her family wouldn't. Counselor, if I could interrupt for a moment. Yes, you are. Why wouldn't the efforts at concealment ultimately be enough to round out the circumstantial evidence, in other words, the implausible statements to law enforcement after the fact? At some point, why wouldn't that be enough for a reasonable jury to conclude that she knew that harm to Mr. Thornton was the plan? Because the statements came after the fact, came multiple days after he had been shot. By then, she knew he had been shot. So they certainly show that by that point, she knew that, well, she knew what we know now. But for her to have foreseen it, I think, you know, overlooks the fact that, again, what they did was not the sort of thing that one would just intuitively expect. You know, the way that when she had wanted to avoid unsupervised visit six months earlier, Alyssa had drafted an email saying, truthfully or not, that their father had had a heart attack and that they had to cancel the visit. That was how, up to this point, her family had solved her problems for her. And there was no evidence at trial that would suggest that suddenly she would have expected some sort of violent solution instead. But why doesn't your theory essentially require direct evidence of knowledge? And why wouldn't it be permissible in the constellation of facts to conclude circumstantially that a reasonable jury could have reached this verdict? Right. So certainly I don't, and I'm going to go a little over. No, go right ahead. Thank you. Oh, wait. Oh, yeah. Direct evidence. No. Obviously, direct evidence is not required. Mental states may be inferred. But to be a reasonable inference, it needs to follow in some straight line from the evidence. So there are a lot of things that the jury could reasonably infer here. As I acknowledged to Judge Jordan, they could infer that Tiersa knew that one or both of her sisters were going to the same spot to confront Mr. Thornton. The jury could infer that both Charis and Alyssa intended for Mr. Thornton to be shot because of the circumstantial evidence of their presence at the site. And because of the fact that Charis had shot for a vice shortly before that would secure a rifle in a stationary position. The fact that Alyssa had bought binoculars the morning of. Things like that. Certainly things can be inferred. But it becomes a speculative leap if it is, if it doesn't follow in some direct line from evidence, circumstantial or otherwise. Thank you. All right. Thank you very much, Mr. Smith. Mr. Neff. Before you start, I know that you and Mr. Steen are court appointed and we want to thank you for your service, not only to your clients, but to us as well. We really do appreciate it. Thank you, Your Honor. I appreciate the opportunity to speak before the court this morning. I represent Ms. Alyssa Mappson. This case was ultimately tried twice. As I'm sure the court is aware, it's our statement that Alyssa Mappson was convicted ultimately based on, among other things, but more specifically, the introduction of the license plate reading data. And we've moved to suppress that evidence and file a motion eliminating, which the court addressed pre-trial and denied. But to take that a step further during the course of the trial, the government produced a witness, which was essentially a police officer for the city of Hoover without any notice that he would be an expert. We contend that they put him up to introduce these records and their position and the court agreed with that governor's position that it was, in fact, a business record where this data that's being captured that we say is a violation of the Fourth Amendment, when it comes before the court, before a jury, they're putting that individual up as an expert. This is data being stored by a third party. Excuse me, did you move pre-trial to suppress the ALPR records? Yes, ma'am. Okay. We moved in limiting, right? I'm sorry, I didn't mean... But you, I guess the district court treated it effectively as a motion to suppress. That is correct, Your Honor. And the issue had, fortunate or unfortunately, we were able to, we had the first trial that had the mistrial, so the issue had come up twice at that point. So not that there was a lot of research out there on this particular issue. Most of the research takes us back to cell phone data, cell phone tower data, but the license plate readers and red light cameras, this is a new era, at least from my research. Does it matter for your argument how many images are captured? No, sir. I mean, Carpenter dealt with aggregation of cell phone tower data, right, to be able to try to triangulate and pinpoint the location of a cell phone. If you had one such reader at a toll plaza at the border between Florida and Alabama, would your argument be the same, that there would be a Fourth Amendment violation? Probably not, Your Honor, and I think if you use the, what you've given as an example, is the one reader and that, only that reader, but this is a continuation as, and we'll use this example. I know, but I'm trying to figure out what the Fourth Amendment principle is, and I'm concerned about it too. I think it's a hard issue after Carpenter, but if the taking of a single image of a license plate at a single toll plaza at a border between two states doesn't implicate the Fourth Amendment, what's the line? What does? If the court deems that it's not a Fourth Amendment issue, then obviously there is no argument. It's asking a question, like what's, at what point does it become a Fourth Amendment? If one image doesn't trigger a Fourth Amendment expectation of privacy under Carpenter and its progeny, when does the Fourth Amendment line get reached? I think when it is, when you put it into totality of circumstances and the use of that, not just that, there's not likely going to be a one image situation because they take the next image and then the next image as that vehicle travels up the interstate or whatever roadways. One example that comes to my head pretty easily is when you have helicopters or airplanes, drones flying over properties and the line of cases, that's not cited here, but you use that example, whether or not, how close can they get to someone's property or the cartilage of their property to be able to view what's on the property and when does it breach an individual's privacy? We all recognize the roadways are crowded and the vehicles go and you drive at your own accord, but for the government to track us through a GPS tracker or these tags, which essentially is the same as a GPS tracker, as it travels or as you travel up and down the interstate, your movements are being tracked and that's where the heart of the Fourth Amendment argument that I feel, that's where it comes from. You say that the search is per se unreasonable. Does that mean that you can never do it or that government needs to get a warrant to access that data? I feel like if the data's there and they understand through the course of their investigation and they want it, then they need to issue a subpoena or get a warrant to obtain that. Here, this data is stored, as I understand, by a third party. It's kept in their ordinary course of business, but they don't have regular training expertise. They don't even put the people up that you could call an expert. Where in the record is there a development about the software itself and the extent of the photos that it captures, etc.? There was no evidentiary hearing on the motion to suppress, correct? No, sir. No, ma'am, I'm sorry. Which again, kind of gets me to my first point. Why is your evidentiary challenge to the photos properly before this court to the extent it is based on a Fourth Amendment challenge that wasn't raised in a motion to suppress? Because it seems that you're relying, at least in part, on extratextual information about the technology, which is really not fleshed out in the evidentiary record because it was raised in the form of a motion to eliminate. That was from a trial strategy. That's just how we chose to move forward. I understand your point as far as not having had an evidentiary hearing and to the extent that we attempted to argue that as it relates to software through the government's witness that we contend was an expert or put up as an expert, and he couldn't answer any of the questions as to the storage, the chain of custody, how the data is collected, which ties in my position back into this concept of, well, they're capturing it in an unconstitutional manner, even though they're not the ones storing it, and then they just reach out and grab it when they want it. So if a warrant would fix that issue, then possibly law enforcement should have to get the warrant since they know the data is there and it's available for them essentially whenever they want it, is my understanding. I'll keep you over your time for one more question. The government argues alternatively on the Fourth Amendment issue that the exclusionary rule should not apply because here the extraction of the data took place by coincidence a day before Carpenter got decided, and so in the world where you presume that police officers act in accordance with established law at the time, the officer would have been entitled to rely on this court's decision, for example, in Davis and not have to anticipate what the Supreme Court decided in Carpenter. So I want to give you a chance to respond. You know, I think given that analogy, you know, officers have the daunting task of dealing with what they have in front of them on a daily basis and what they're taught in their training and experience. Whether they're tracking case law or not, we don't know, but certainly they gain education and get guidance from the prosecutors, U.S. attorneys. So at the time before Carpenter to say that they weren't acting in good faith, I don't think I can go that far. I just think the way this incident and the way it came about is just so unique, which is why we're here with the challenge. All right. Thank you very much, Mr. Mapps. Thank you. Mr. Steen. Good morning, Your Honors. Good morning. Glad to be here in front of y'all. It is an honor to be here in front of you, to argue in front of this Court. Charis Mappson was my client, and I challenged the sufficiency of the evidence only to the special finding that she was the one that actually fired the shot. By cell phone records, Your Honor, we have two people in that same position. There's no way to tell which one it was. The investigators searched areas that they figured where the shots could have come from without any luck of finding any type of evidence, footprints, where people may move, shell casings. And then the next day they went there again, searched about four or five hours, never found any direct evidence that a gun had even been fired from that area, much less fired by my client. He said that he went back to the car, the investigators talked about going back to the car, and he said got an eyeball shot of where he thought the trajectory would come from. And that put him at a place in the woods by a church about 150 yards away. All of the shots hit the ground prior to hitting anyone or anything about 25 to 30 foot in front of where the back of the car was parked. What shots are you talking about now? What shots are you talking about now? Well, the shots that were captured on video, where they watched it, slowed it down to where they could see where the pavement, this would be the shots that would come from the area that they think it was originating from. And that's the area that they searched that found no evidence of a gun being fired or any evidence of anybody being around that area. But we know that a gun was fired from somewhere. We know that a gun was fired from somewhere, but we don't know who fired the gun. But what about the circumstantial evidence concerning your client, tying her to potentially being the shooter? And all through the trial, that was their strategy, Your Honor. She was a former Marine, so she was highly trained in long-range firearms, which would be in the military a M16, but in the common use probably the M4 or AR-15 type weapon. And my thought process after reading this is she's the one that's firing it, and she knows she's shooting low. She knows to raise it up, because that's the way she was trained. You aim higher. This didn't show any change because of all of the dust that was flying right behind the car. So it could have been no other sister, because there's cell phone records that show that both were in that area during that time period. And so I think that it's just hard to come back only because she was a former Marine. But is that the only thing? I mean, she had told her romantic partner, right, that she had a firearm or other weapon that would have been compatible with the ammunition, at least to some extent, combined with the fact that she had gone to the range at some prior time and purchased equipment that would have allowed her to elevate. Why putting all of that together? Is that not enough? Well, putting that together, Your Honor, is part of some of that transpired a year prior to it, the time that she actually rented and paid for targets to be fired at. So next time, it only shows the invoice to her, not a record that she paid, but an invoice to her for a BevBlock, which is a tool that's used to where you can set the gun down in the magazine well and make modifications to the gun. That's what it is. And they don't know that she even like that. The government did bring up the part that she admitted to an ex-boyfriend that she had an AR gun. But that conversation, Your Honor, was three other men in a truck, they're going to work, they're in Texas, and they start talking about firearms that day. And they start talking about the AR type. And of course, she pipes up and says, well, I've got one. And the response from the rest of them says, you only have one. So I don't know that that's a statement that she really does have one or she's boasting herself in front of her workers. So that's the reason I don't think you can take that to heart as being hard circumstantial evidence that she did it. All right, Mr. Steen, thank you very much. Thank you, Your Honor. Your Christian. Thank you, Your Honor. May it please the court, Praveen Krishnan for the United States. Unless this court would prefer otherwise, I'll begin with the ALPR issues and then I'll turn to the issues about the sufficiency of the evidence for the defendants. So with respect to the ALPR data, let me just begin by clarifying something in the record, which is that the motion in Lemony was filed the day before the first attempt at trial. And then the district court ruled, a mistrial was declared, and then it was renewed in the middle of the ultimate trial that's resulted in the convictions here. And so throughout, there's been a very tight timeline, which means that we fully agree that these challenges are preserved, but the facts that are required to reach all of the contentions that Alyssa Mappson has raised, they're just not in this record. So to begin with the Carpenter and the Fourth Amendment issues, Carpenter expressly permits warrantless tracking when it is of a, quote, discrete automotive journey. And that's exactly what we have in this case. Alyssa Mappson's truck traveled. That's dicta, right, from Carpenter, because that issue was not present in Carpenter. That issue was not present in Carpenter. However, Carpenter was reconciling its decision with Knott's, and so Carpenter reaffirmed the holding in Knott's, which said that, generally speaking, when a car travels on public thoroughfares, there is no right to privacy. And Carpenter was explaining that, at least in the context of Knott's, where you're dealing with a specific journey, that is consistent with Carpenter's broader holding that there's a right to privacy in the totality of an individual's physical movement. Of course, the third-party doctrine was seen as something clearly established, and Carpenter sort of obliterated it when it came to cell phone technology. So I'm not sure you can leave, you can say that Carpenter just leaves everything out there completely undisturbed. I mean, it broke new ground in a lot of ways. Well, it did, but it also described itself as a narrow decision, right? And in here, we're not talking about, I mean, so basically, I think what we're, I think we can look at it this way. So in Carpenter, the court relied heavily on the volume of data that was generated by the cell site locational information. In contrast, here, we've got a road trip that's from Florida to North Alabama, that's a round trip that's roughly 1,300 miles, and we only have three locations in that entire period. So I'll ask you the reverse of the question that I asked Mr. Neff. If you had a trip from Key West, Florida to Seattle, Washington, right, a trip that takes a fair amount of time by car, and you have 2,000 images captured of a car and its license plate on the way, is that different? It is different. However, that would still not be a search, I think, for several reasons. So first... So the amount doesn't matter? It depends on how that information could be used, right? Because Carpenter was focused on what... You're using it to find out if the people inside the car committed armed bank robberies at federally insured institutions all the way from Key West, Florida to Seattle, Washington. Right. And that's a permissible use. I think the question under Carpenter is whether that volume of... That kind of a query could also lead the government to learn about a person's religious life, their political views, their romantic life, all of the privacies of life and all of the dimensions. Right, but that's really the problem with this particular technology, which is that if you can ascertain, and you start in Key West, and you're going to go all the way to Alabama, and you make stops along the way to, you know, the house of someone you're having a relationship with or to do something else at another location, I mean, the government is learning a lot of information about you, aren't they? If that's the technology? You went to a church, you went to a bookstore. Sure, I mean... You went to a college, you went shopping, you went into this particular store, you went through a drive-thru at McDonald's, now Burger King. Sure, and I have, I guess, two responses to that, which is, first, if we assume that these cameras are everywhere... Well, and I guess that's one of the questions I have because one of the issues is that there was no evidentiary hearing, right? I'm not really sure why there wasn't an evidentiary hearing because if the district court judge treated it as a suppression hearing, as a motion for, to suppress, there should have been an evidentiary hearing of how this technology works. Well, I think there were a couple of reasons. So, first, because this was so, filed so late, I don't think it would have been an abuse of the discretion for the court. It may have been filed late, but because of the fact that there was a mistrial, then there was a second trial, and they just decided, the district court judges, decided to leave that motion pending. The court had ruled on it during the first mistrial, and then it was only renewed in the middle of the second trial, and so trial had already gone underway, and the facts that were alleged in that motion just wouldn't be sufficient to establish a Fourth Amendment violation, and so that's the problem, is because... Well, I'm not, I'm not really sure how you, how you can make the determination without the district court judge determining how the technology works. How can you make that decision that there's no Fourth Amendment violation without knowing how the technology works? Well, we have... Or what the technology captures, or how it, you know, does it capture, does it ping? I mean, I don't really understand how the technology works. Sure. What, the court could make that determination because it had the reports in the record, and we know that whatever was produced, it was highly limited, and so we're just, as every court that's considered this technology and reached the merits of this issue has concluded, we're just very far afield from all of the concerns that were in Carpenter just because the sheer volume of data isn't anywhere close to what was presented in Carpenter, and another distinction here is that this technology isn't just being used by the government. It's being used by retail outlets, by repossession companies. The private sector has access to this information and to this technology, and under doubt... ...the technology in Carpenter, too, for its own purposes. Where do I need, where do we need to build new towers? Where are people moving? Where is their usage? Where are we having technical problems? Right? And to figure out where to triangulate calls. When does someone go from regular service to roaming? Right. The distinction there, though, is Carpenter noted that in the private sector, they were not using this technology to track individual people. It was being used in bulk for precisely the reasons that you've discussed. However, ALPR technology is being used by companies, by retail outlets that think that somebody stole some property from their store. They're using it to find individual vehicles, just as the government was doing, and... Does that make it better or worse? If the technology is already being used to track? Right. Use it to track, too? Under Dow Chemical, that's one strong indication that a search has not, that we don't have a Fourth Amendment search here. When you've got something like, when you've got technology that is acquiring facts about people that private organizations can do, businesses can do this, and get this information without a court order, then when the government uses the same technology on the same terms, that's a strong indication that there isn't a search here because it indicates... I mean, that just seems completely messed up to me because private corporations are not subject to the Fourth Amendment. The government is. Right. But we're also talking about a reasonable expectation of privacy. And so, social norms are dictated in part by what businesses do. And so, it isn't so exceptional for the government to do the same thing that a business does. So, for example, in Dow Chemical, the government flew an airplane over a chemical plant, and it had a special sort of a photograph that was able to get more detail than you could see from the naked eye. And the Supreme Court said that that was completely permissible. That wasn't a search, and it didn't violate the Fourth Amendment. And one of the facts it noted was commercial enterprises could rent the same plane, have the same camera, do the same thing. And so, under that logic... And this, I think, follows from the principle that, you know, if, say, for example, there's an open window in a home, and a neighbor can see evidence of crime through that window, there's no more of a search if it happens to be a police officer who's looking through that window instead to see that same evidence. And so... Let's switch. If you're asking us to address this issue, we don't know if we're going to need to, but there are big metropolitan cities around the world, London to take one, where there is CTV at every corner. Every single corner has a camera to monitor the movements of pedestrians, people, cars, etc. If that sort of technology was put in place in a large city in the United States, let every single square block was covered by a camera, and was able to track the movements of particular individuals, would that trigger privacy protections of the Fourth Amendment? And if that was exclusively operated by the government? No, no, no. Used by private corporations, to use your example, and the government buys into a database that lets them access everything. We'd like that data. We'll pay for it. Sure. Well, I think in that case, under Dow Chemical and under Kylo, that wouldn't necessarily implicate the Fourth Amendment, because the Fourth Amendment isn't the only vehicle that society has for addressing issues of privacy. And it seems to me in that kind of a circumstance, there's a bigger question about privacy in terms of what are companies allowed to know versus what is the government allowed to know. And the Fourth Amendment question here is just, it's meant to simply protect the social norms that we have, and to make sure that the government follows those social norms. And if those norms have shifted, then I'm not sure the government is going to be able to do anything about it. But of course, this case is so far different from all of these hypotheticals that it really doesn't implicate any of these issues at all. I think you might be a little bit naive in thinking that an opinion written on this issue is not going to have any impact on those so-called crazy hypotheticals. Well, then I'd simply note that, you know, under the good faith exception and under harmless error principles, this Court doesn't even really need to reach this issue at all. Because the case against Alessa Mappson was so strong that these three data points, they don't make a difference in terms of the ultimate determination of guilt. Okay, so let's assume that you exclude the truck. Tell me what the evidence is that's overwhelming against Alessa. Sure. So we've got the cell site tower location information that places her in Eldridge at the time of the shooting. We have her text to Sharos Mappson giving Sharos the address of Barbara Ann's place, the gas station that's the location of the shooting. We have her statements to the FBI where she admits that at the very least her truck was used to go to this gas station. We also have the statements of her sister who also at least admitted that the truck went to the gas station, although they both say that a third party drove that truck instead of them. We have her notes in that she was in Alabama and that she was involved in these plots. All right, let's turn to sufficiency because you're in a run out of time at some point. Oh, sure. So let's talk about Tierzan. The government argued at least in part at closing that the jury didn't have to find out that she agreed with her sisters to shoot the victim. That was wrong. That was wrong. And before that, before the government made that statement, the government said, quote, the law does not require that a member of the conspiracy be present at the time. Only that that member knew it was going to happen. And so I think that the part that my friend is quoted, that was a misstatement by the government. And because what the government says afterwards is it makes no difference if you find tiers of maps and knew what was going to happen. It makes no difference that she was not at the scene. So I think that the government just meant to say it doesn't matter whether or not she was physically present. How do we how do we infer her agreement that the victim would be shot? Sure. I think there's plenty of evidence, sufficient evidence that she agreed with one or more of her sisters that they would go meet the victim in Alabama and that he would be lured by deception to be there too. So how do we get to the next step, which is they also agreed that the reason for the shooting was to do him harm through violence? Sure. So let's look at, I'll start at, I'll start with the shooting and then move forward. So the shooting occurs at 5 40 p.m. And if we look at government's exhibit 7, entry 83, that is a communication between Elissa Mappson and Tiers of Mappson. And that takes place at 6 40 p.m. So that is an hour after the shooting. And in between, Tiers of Mappson had been told about the shooting from Joshua Thornton's family. So the fact that she doesn't immediately... You said had or had not been told? She had been. Had been told. And so the fact that she knew about the shooting, yet didn't immediately reach out to her sisters whom she expected to be at that location, the jury could reasonably infer that she didn't reach out because she knew exactly what was going to be happening. And this is also underscored by the testimony of Rebecca Hankinson, the mother of Joshua Thornton, who said that when she spoke to Tiersa, Tiersa was upset, but it seemed insincere. It seemed feigned. And Tiersa goes from apparently being concerned about the welfare of the father of her child on the day of the shooting to two days later accusing him of some fairly outlandish crimes. And these crimes are significant because they suggest that she's trying to conceal her involvement in the shooting and she's trying to create this image that perhaps he's involved in organized crime and that there are other people who would be interested in... Gang violence, that's right. And you say it's outlandish, but I mean, that was her statement that she believed he was involved in potentially a gang or gang violence. I mean, I don't know anything about this individual. I mean, I don't know what the evidence was that was presented as to him, but I mean, you say it's outlandish, but it's a plausible theory if he's involved in a gang. I don't, well, I think coming from the source, remember because Tiersa Mappson had also said that she had lent her sister's truck to a man who had been stalking her for many years and had threatened her life, but she couldn't describe that person. She said that her family didn't know about him. And so, taking that all together, I think a jury could reasonably believe that these allegations about gang activity were not credible, in particular when an FBI agent testified that there was no gang activity at that time and the location was decided very late. It was decided the day before the shooting, so very few people could have possibly known that Joshua Thornton would be at Barbara Ann's place in Eldridge, Alabama, a city or town to which he has no obvious connection whatsoever. I know that a jury verdict doesn't have to negate every possible hypothesis of innocence, but humor me on this. Why couldn't she have been protecting her sisters after finding out, to her surprise, what they had done? In other words, they agree that the sisters are going to go to tell him something that may somehow fix the domestic problems that are ongoing, and then she finds out from Joshua's family that he's been shot, and her reaction is, oh my God, my sisters, one of them shot him, and she wants to protect them. Not because she knew beforehand what they were going to do or had agreed to the shooting, but because she's now figured out that, oh my God, they've done something and I want to protect them. Sure. Well, I think that certainly, I think that a lot of that, that makes sense except for her statements about, say, the father of her child. I think that her statements go beyond a simple desire to protect her sisters into, I mean, frankly, they reflect a great deal of animosity towards Joshua Thornton. That would be absolutely consistent with her involvement in a plan to have violence come to him, and my friend also referred to the immense amount of dependence that Tears of Mapsen has on her sisters, but I think that point cuts both ways because it shows that they really have no reason to hide anything from her, because if they're the ones running the show, they don't need to worry about her standing up and objecting and saying that this is too far. We need to be reasonable here, and so given the deferential standard of review here, there's certainly more than sufficient evidence to uphold the convictions for Tears of Mapsen. Now, as for Charis Mapsen and the question about the dangerous weapon, now, this panel's noted already about the evidence showing her involvement with firearms, but it's also important to point out that during her interview with the FBI, she denied ever being in Alabama. She denied ever having her cell phone in Alabama, and she also denied owning a firearm or having any interest in firearms or shootings because she was now an active mother and just didn't have time for that. However, the day before the shooting, she looked up the location of the local shooting range before she went down to Eldridge, and the morning of the shooting, she got a text message from her sister saying, it's just Halo. So, again, that is more than sufficient evidence for a jury to conclude that she did use a dangerous weapon in these offenses. Now, can you get back to Tears for just one moment? Oh, sure. In list form, what is the strongest circumstantial evidence you have to support the conviction of Miss Tears of Mapsen? In this? In a list, like, if you were to bullet it out. Sure, I would start with her efforts at concealment because I think that those do show that it can be taken as knowledge and evidence of her criminal intent. So, by that, you mean the different stories she told law enforcement? Yes, the different stories as well as the notarized letter that she had prepared, and she claimed not to be aware of the shooting at first when she spoke to law enforcement. She also, the fact that her story is coordinated with the story that Alyssa Mapsen gave, that shows that they were working together, and so Tears has conceded that there was sufficient evidence for Alyssa Mapsen's conviction, and by the same token, there's reason to think that she was working with Alyssa Mapsen and would have been party to the same plan. And then during the, after, immediately after the shooting, her reactions, her strong sense of freaking out appears to be inconsistent with her immediate accusations that Joshua Thornton has been involved in serious crimes, that there's nothing the records support that. And then the heightened level of communication on the day of the shooting, coupled with the drop-off in communication  those, I think, are the highlights that would show she knew exactly what was supposed to be happening. And then factually, in terms of selecting the location and then sort of prolonging his stay there? Exactly, exactly, exactly. And actually, I just wanted to return to one brief point about the expert witness issue that Alyssa Mapsen had raised, which was that Lieutenant Davis was testifying just as a lay witness, and we weren't seeking to admit these records as business records. And, well, I see that I'm over my time, but... You can finish. Sure. And so this was fairly straightforward. To enter these, to retrieve these reports, was just to type in a license plate and to put in a particular date. It was not an especially difficult thing to do. It does not require technical knowledge, and so there was no expert witness that needed to be. And he wasn't asked any questions of any expertise? No. He spoke about everything at a very general level, and so it wasn't an abuse of discretion to have him testify in that capacity. Who testified about what the data was retrieved from the database? I think he did test, he described the reports. I mean, like, in terms of, like, here's a picture of a truck and here's the Google Maps. His explanation of how the data got extracted isn't testimony about what the data showed, right? Right, right. Who testified about what the data showed? He did, or another witness? I'm sorry, I think... If we're talking about data, we're talking about the ALPR reports? Yes, or what they contained. I think that they spoke for themselves, and so... You had no, but no witness testified about them? You just, you just... He was the one who... You just took an exhibit, marked it, and gave it to the jury? He was the witness through which they were introduced, and he just said, you know, this is a photo of a license plate in Carroll County, Georgia, at 1153 a.m. No one testified as to how this technology works? That's right, that's right. Okay, thank you very much, Mr. Krishnan. Thank you. Thank you. I'll try to briefly address a few points that the government made. First, they noted that when Tirza first was informed that Mr. Thornton had been shot, she didn't immediately call Alyssa Archares, and that is true, but she did immediately act. First, she sent, she responded to Mr. Thornton's mother, who had told her the news, with the most incoherent text message that she sent all day. I point out its incoherence because Alyssa had made a note to herself the night before, write what to text Thorne. Of course, that's open to interpretation, but it is consistent with Alyssa's history of writing things for Tirza. After sending that text message, Tirza immediately called Mr. Thornton's phone to try to reach him, but wasn't able to. The government has said that Tirza's dependence on her sisters can cut both ways because her sisters then had no reason to hide things from her, but honestly, I think what it shows is they had no reason to tell her that they intended violence. She wasn't essential to the violence. They didn't need her to know about it or help about it with any, in any way, and in fact, if she had known about it, then it, you know, she could have objected or tried to talk them out of it, so I don't know how strongly it cuts in either way. I'm not asking the court to reweigh the evidence, but we just don't believe that those details point toward her knowing that her sisters were going to engage in violence. Lastly, I'd reiterate, just as to Judge Cannon's point about Tirza selecting the meetup site, we know that Tirza texted the meetup site to Mr. Thornton, but of course, it was her who sent it. She was the one who was communicating with him. We don't know, there's no evidence that she was the one who selected that site. We would ask the court to reverse the denial of the Rule 29 motion as to Tirza. Thank you. Thank you very much. Thank you. Just as a rebuttal, a little more specific as it relates to Lieutenant Davis and his testimony, the government did, as they've argued today, insinuate that it was just a business record. There was no, as much as we attempted to elicit or gain information or knowledge as to his training, experience, knowledge to how the software's kept, managed, updated, he wasn't able to give any of that and there was no witnesses that were available at the time of trial to explain that, to allow us to explore deeper if there was a problem. And that's where the entire argument as to lack of notice of him being an expert, because his training was limited to, essentially, I know how to turn on a computer and they give me a name or an address or a license and I do a search. And that was the extent of what he was able to testify to. But maybe he doesn't have to testify about more if the report is coming in as a business record. Right, and the court made that determination. Why is that wrong? Because I feel like the defense is entitled, first, Lieutenant Davis should have been disclosed as an expert and had to produce, the report in and of itself doesn't give us enough. Can you isolate in the record, what exact testimony do you say shouldn't have come in because it was too specialized? The report itself coming in to evidence through Lieutenant Davis without previously being established as a Rule 26 report or the establishment that he was an expert and able to verify, solidify the software, how it's kept, managed, updated, and how it can't be manipulated, hacked. He couldn't produce. So it's nothing that he said in sort of describing the photographs. It's just the report itself. No, I have no issue with how he testified. And he testified truthfully to what he had in front of him. But all he had in front of him was the report that was generated from the company that they pay for the services. Again, if that could be manipulated or hacked into, and I'm not saying anybody did anything inappropriate here, it's the bigger picture that we're looking at to make that call that it shouldn't have come in without proper authentication through an expert. That's what I'm, we're trying, I think all of us are trying to get at exactly what it is that you find improper. So let me ask you these questions in order. Yes, sir. Was the report properly admitted as a business record? Yes, sir. Okay. If the report came in properly, then to Judge Cannon's question, what did he testify about that made him an expert? If you say he didn't know anything, how could he be an expert and not provide specialized information to the jury? Sure. So to go back to your first question, the report came in properly as a business record because that's what the district court deemed that it was. We argued that it was not and that it should have been. But I'm asking you, I'm not asking you what the district court did. I'm asking you in your opinion, was the report properly admitted as a business record? Okay. I'm sorry. No, I do not, I do not feel like it was because I feel like he, if he was their person, then he should have been deemed an expert. You know, but this is the difficulty I'm personally having. Generally, a custodian of records who is used to go through the evidentiary requirements for the admission of a business record doesn't have to be an expert in how those reports were generated, doesn't have to know the software. For example, a bank custodian who testifies about monthly reports sent to the Federal Reserve on suspected cash transactions. The records custodian can say, yeah, I generate these every month. I have no idea how our internal analysts put in the software and algorithms to generate the data. But I know that they do it every month and then I'm tasked with printing it out and electronically transmitting it to the Federal Reserve. Although that person may not have specialized knowledge of the underlying technology, I would think that in most cases that custodian can properly introduce the business record. Can I ask a question? Of course. I guess this is the, the question is, the report that came in as a business record, was that a report that was generated by Lieutenant Davis or was it a report that he received from a third party? He generated it. My understanding... He generated from data that he had. From data that was given to him as a request. I want to say maybe from FBI agent Trey Bradford, but I don't want to misspeak. But as I recall, information was given to him to do the search in this software that they pay a service for. When you couple the totality along with the Fourth Amendment argument that we've made, that's why I feel that it's not properly admitted as a business record because you start with the illegal component of the Fourth Amendment issue and then you say, well, if this was obtained improperly, if the defense has a chance to challenge, whether it's the improperness of the search or challenge the software itself and how the algorithms are run, we just don't know. We weren't given enough. But if there had been a pretrial motion to suppress, you could have tried to subpoena people who might have had that knowledge. Yes, sir. That certainly was an avenue that could have taken place. All right, Mr. Neff. Thank you very much. Thank you, yes. All right. Thank you all very much. It's been helpful.